# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**C.D. LUCERO and SUSAN VINCI-LUCERO,**

      **Plaintiffs,**

vs.                                                                                       Civ. No. 17-1065 JCH/JFR

**UNITED STATES OF AMERICA,**

      **Defendant.**

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

In this case, the Plaintiffs claim that they are entitled to a refund on their 2014 tax bill. As grounds for their claim, they contend that they overpaid federal income taxes because the stock that they received that year as part of a legal settlement was overvalued at $2.38 per share, and that $0.57 per share is the fair market value of the stock. On June 30, 2020, the case came before the Court for a non-jury trial. In light of the COVID-19 pandemic and by consent of the parties, the Court conducted the trial via videoconference. The parties provided the Court with paper copies of their exhibits in advance of trial and also displayed them onscreen during the trial. Having considered the testimony, the exhibits admitted at trial, and the arguments of counsel, the Court makes the following findings of fact and conclusions of law.

## APPLICABLE LAW

**I.     Burden of Proof**

The parties agree that the burden of proof by a preponderance of credible evidence is on the plaintiff taxpayer in a tax refund case. *See* Doc. 58 at 6 (citing *Blodgett v. Comm'r*, 394 F.3d

1030, 1035 (8th Cir. 2005)) and Doc. 59 at 4 (citing *In re Tax Refund Litigation*, 989 F.2d 1290 (2nd Cir. 1993)). Credible evidence is that "which after critical analysis, the court would find sufficient up on which to base a decision on the issue if no contrary evidence were submitted (without regard to the judicial presumption of IRS correctness)." *Blodgett v. Comm'r*, 394 F.3d 1030, 1035 (8th Cir. 2005) (citing *Griffin v. Comm'r*, 315 F.3d 1017, 1021 (8th Cir. 2003)). Once the plaintiff meets that burden, the burden of proof shifts to the government. *Id*.

## II.     The Value of Stock in a Closely Held Corporation

It is undisputed that the company at issue, the Good Technology Corporation ("GTC"), was a closely held corporation and that its stock was not traded on an open public market. When a stock is unlisted or has no established market, a fact finder must determine the fair market value of such stock for purposes of taxation. Stock is valued on the date the shares are issued, or the date it is constructively received by the taxpayer. *United States v. Roush*, 466 F.3d 380, 385 (5th Cir. 2006). The determination of fair market value is a question of fact. *Eyler v. Comm'r*, 88 F.3d 445, 451 (7th Cir 1996).

The parties agree that the value of stock in a closely held corporation where no public market exists is generally measured in terms of its fair market value, which is the price at which a willing buyer and willing seller with knowledge of all the relevant facts would agree to exchange the property or interest at issue. Rev. Rul. 59-60 at § 2.02, 1959-1 C.B. 237 (1959). *See also* Doc. 58 at 7; Doc. 59 at 5. "A sound valuation will be based upon all the relevant facts, but the elements of common sense, informed judgment and reasonableness must enter into the process of weighing those facts and determining their aggregate significance." Rev. Rul. 59-60 at § 3.01. "While listed prices normally establish fair market value of publicly traded stock, the value of unlisted stock is best determined by considering actual sales at arm's length in the normal course of business within

a reasonable time before or after the valuation date. *Estate of Andrews v. Comm'r*, 79 T.C. 938, 940, 1982 WL 11197 (1982); *Fitts' Estate v. Comm'r*, 237 F.2d 729, 731 (8th Cir. 1956); *Estate of Noble v. Comm'r*, T.C. Memo. 2005-2 at *5. When arm's-length sales of unlisted stock are unavailable or inconclusive, the value of closely held stock shall be determined by considering all other available financial data and all relevant factors that would affect fair market value. Rev. Rul. 59-60, 1959-1 C.B. 237. These factors include the corporation's net worth, prospective earning power, dividend-paying capacity, and other factors. *Id.* § 4.01; *Estate of Andrews v. Commissioner*, 79 T.C. at 940. These factors cannot be applied with mathematical precision, and the weight given to each factor must be considered in light of the particular facts of each case. *Estate of Andrews v. Commissioner*, 79 T.C. at 940-41.

When considering expert testimony, a court is not required to follow the opinion of any expert if it is contrary to the court's judgment. *Estate of Deputy v. Comm'r*, T.C. Memo. 2003-176 at *5 (citing *Helvering v. Natl. Grocery Co.*, 304 U.S. 282, 295 (1938) and *Silverman v. Commissioner*, 538 F.2d 927, 933 (2d Cir. 1976), *affg.* T.C. Memo. 1974-285). A court may adopt or reject expert testimony and will reject expert testimony where the witness' opinion of value is so exaggerated that the testimony is incredible. *Estate of Hall v. Comm'r*, 92 T.C. 312, 338, 1989 WL 10688 (1989); *Chiu v. Comm'r*, 84 T.C. 722, 734-735, 1985 WL 15340 (1985).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### Background

1.  Plaintiffs C. D. Lucero and Susan Vinci-Lucero are residents of Santa Fe, New Mexico. [Bench Trial Transcript ("Tr.") at 8].

2. Prior to 2012, Ms. Vinci-Lucero worked for GTC as a senior Vice President of marketing. [Tr. at 11]. GTC offered a secure mobility platform for enterprises and governments that enables secure access to applications and data across devices and operating systems. [Ex. 7 (Information Statement and Solicitation of Written Consent Regarding Proposed Merger and Notice of Appraisal Rights) at 8].

3. As a marketing executive and Vice President, Ms. Vinci-Lucero was not privy to comprehensive information regarding the financial condition or day-to-day financial operations of GTC. [Tr. at 13].

4. In February of 2012, Ms. Vinci-Lucero was diagnosed with breast cancer. She underwent surgery and chemotherapy. In May of 2012, her boss at GTC told her not to come back to work while she was going through treatment because it was "disruptive to business." [Tr. at 13-14]. Then in July of 2012, the CEO of GTC asked her to leave the company. [Tr. at 14].

5. In October of 2012, Ms. Vinci-Lucero sued GTC for disability discrimination and wrongful termination. [Doc. 66 (Pretrial Order) at 5, ¶ 1; Tr. at 15].

6. In December of 2012, Ms. Vinci-Lucero decided to exercise stock options that had vested during her tenure with GTC. [Tr. at 49]. She retained a securities lawyer who found a buyer for her stock, Harvest Growth Capital ("Harvest Growth"), and negotiated the sale price. [Tr. at 49-50]. Ms. Vinci-Lucero exercised her option to buy 812,500 shares of GTC at $.66 per share, and on the same day she sold them to Harvest Growth at $3.80 per share. [Tr. at 50; Ex. 17 (Stock Purchase Agreement)]. Harvest Growth was already an investor in GTC, and it acknowledged in the purchase agreement that there was no market for the shares it was purchasing. [Tr. at 50-51; Ex. 17 at 5, ¶ 2.2(k)].

7. During the disability discrimination and wrongful termination lawsuit and subsequent settlement negotiations, Ms. Vinci-Lucero requested but GTC did not provide Ms. Vinci-Lucero with significant information about the company's financial status that could impact the company's stock value. [Tr. at 17, 19-20].

8. Despite her discovery requests asking for the company's financial information, GTC did not provide it, and Ms. Vinci-Lucero did not know specific facts about the financial health of the company, such as gains and losses. [Ex. 16 (GTC's Amended Response to Vinci-Lucero's Request for Production]. GTC did not inform Ms. Vinci-Lucero of its adverse financial condition at the time of settlement. [Tr. at 17, 19-20].

9. However, on both December 6, 2013 and December 18, 2013, GTC provided Susan Vinci-Lucero with a chart showing twenty valuations and sales of GTC stock between March 2012, and November 2013. These stock sales ranged from a low of $2.35 a share in March 2012 to a high of $5.50 a share in August 2012. The stock sale closest in time to the settlement between Good Technology and Susan Vinci-Lucero occurred in November 2013 at a per share price of $2.38. [Ex. 16 at 7 of 11; Doc. 66 at 5, ¶ 7].

10. On April 23, 2014, five days before trial of her discrimination and unlawful termination lawsuit, Ms. Vinci-Lucero and GTC settled. The agreement was reached at a settlement conference in open court. [Doc. 66 at 5, ¶ 2; Ex. 2 (Cal. state court transcript)]. The settlement had three payment components: (1) the payment of $500,000, payable by check to Ms. Vinci-Lucero; (2) the payment of $1,750,000, payable by check to The Trust Account of Scott Banagofsky FBO Susan Vinci-Lucero; and (3) the payment of $1,547,000, to be made by the transfer of 650,000 shares of GTC common stock. [Ex. 2 at 2-3, 7; Ex. 3 (Settlement Agreement) at 1-2]. The third component represents a per share price of $2.38. [Doc. 66 at 5, ¶ 3]. This is the

same per share price at which the stock was sold six months earlier, as noted in the preceding paragraph.

11. Plaintiff told the Court that: (1) she agreed to the settlement terms; and (2) she agreed to be bound by those terms. [Ex. 2 at 4, 7-8].

12. On May 14, 2014, just a few weeks after settlement, in an effort to support its desired initial public offering, GTC filed its Form S-1 with the Securities and Exchange Commission in which it set forth extensive financial information, including its recent losses.[1] [*See* Ex. 9 (GTC's Security and Exchange Commission Form S-1)]. For example, GTC had net losses of $41 million in 2011, $90.4 million in 2012, and $118.4 million in 2013. [Ex. 9 at 13]. At the time of settlement between GTC and Ms. Vinci-Lucero, GTC's operating expenses exceeded its revenues. The company had an accumulated deficit of $608 million as of December 31, 2013. [Ex. 9 at 13]. The Form S-1 balance sheet for the quarter ending March 31, 2014 of The Good Technology Corporation showed that for the quarter ending March 31, 2014, the corporation had a negative net worth of $126,711,000, and that it was operating at a loss. [Doc. 66 at 6, ¶ 14]. None of this information was available to Ms. Vinci-Lucero at the April 23 settlement conference held just a few weeks earlier.

13. On August 1, 2014, several months after the settlement conference, the parties signed a written settlement agreement. [Doc. 66 at 5, ¶ 4; Ex. 3]. In that agreement, Ms. Vinci-Lucero again acknowledged that she had read and understood all of its provisions, that she had 21 days to review and consider it, and that she had seven days after execution to revoke it. [Ex. 3 at

---

[1] S-1 forms filed with the SEC are publicly available. [*See* Tr. at 90-91].

7, 10-11]. Ms. Vinci-Lucero testified that by this time, and before signing the settlement agreement, she had seen GTC's S-1 and "had assumed that they were doing well." [Tr. at 40-42].

14. On August 11, 2014, in accordance with the settlement agreement, GTC issued 650,000 shares of GTC common stock to Ms. Vinci-Lucero with an asserted value of $2.38 per share and an effective date of April 23, 2014. [Doc. 66 at 5, ¶¶ 3, 5; Ex. 11 (Stock Issuance Agreement); Ex. 12 (stock certificate)]. The stock was subject to a lock-up agreement, which provided that the company had the right of first refusal, that the unregistered stock could not be sold until it was registered, and that it was subject to a lock-up period. [Doc. 66 at 5 at ¶ 6; Ex. 11 at 1-3].

15. The January 29, 2014, minutes of a meeting of the Board of Directors of GTC state that the Board determined the value of GTC's Common Stock to be $4.10 a share, even though the independent report of Valuation Research Corporation valued the stock at $3.53 per share as of January 15, 2014. [Doc. 66 at 5, ¶ 8].

16. The June 12, 2014 Minutes of a Meeting of the Board of Directors of GTC state that the Board determined the value of GTC's Common Stock to be $3.88 per share as of May 31, 2014, based on an independent report of Duff & Phelps. [Doc. 66 at 5-6, ¶ 9].

17. The July 30, 2014 Minutes of a Meeting of the Board of Directors of GTC state that the Board determined the value of GTC's Common Stock to be $4.32 a share, even though the independent report of Duff & Phelps valued the stock at $3.88 a share as of May 31, 2014. [Doc. 66 at 6, ¶ 10].

18. These board minutes were not made available to the Plaintiffs at any time prior to this lawsuit. [Doc. 66 at 6, ¶ 11]. There is no evidence in the record demonstrating how the GTC Board of Directors arrived at those asserted stock values.

19. GTC merged with a subsidiary of Blackberry Company in September 2015. The merger was an arm's-length transaction. [Doc. 66 at 6, ¶ 16].

20. On or about September 30, 2015, Ms. Vinci-Lucero received an information statement from GTC regarding its proposed merger with Blackberry. [Tr. at 42-43; Ex. 7]. The document states that GTC had attempted to prepare for an initial public offering ("IPO") of its stock in 2013, abandoned those efforts, and then decided to try again in the spring of 2014. [Ex. 7 at 11]. GTC again abandoned its IPO, citing "the declining market performance for comparable issues in the technology market and the corresponding impact on investor sentiment." [Ex. 7 at 11]. Instead, GTC decided to explore "raising capital on a private placement basis during the summer and fall of 2014." [Id.] Ms. Vinci-Lucero testified that from reading this, she learned that GTC was "generally failing" and "would have to raise capital privately." [Tr. at 43].

21. Following an appraisal demand and ensuing lawsuit, a settlement was reached valuing the merger's common stock redemption price at $.48 per share. [Doc. 66 at 6, ¶ 15; Ex. 10 (Letter dated July 31, 2017, to Ms. Vinci-Lucero from counsel for GTC)]. On August 28, 2017, Plaintiff Susan Vinci-Lucero agreed to redeem her 650,000 shares of Good Technology common stock at this $.48 per share redemption price. The settlement was independent of payments due under the merger agreement's escrow fund, as well as any payments recovered from a pending breach of fiduciary duty action concerning the merger. [Ex. 10].

22. The Plaintiffs filed their 2014 income tax return reporting the settlement proceeds with a value of $1,547,000.00, which equates to a value of $2.38 a share. [Doc. 66 at 6, ¶ 12]. As a result of this and other income, the Plaintiffs paid $1,079,461 in federal income tax for the year 2014. [Doc. 66 at 6, ¶ 13]. Later, the Plaintiffs timely filed an Amended 2014 Individual Income Tax Return with a claim for refund. The basis of the claim was that the GTC common stock

received by Susan Vinci-Lucero was not worth the $2.38 per share shown in the Settlement Agreement. [Doc. 66 at 6, ¶ 17; Ex. 1 (Plaintiffs' Amended 2014 Tax Return) at 3].

23. On September 8, 2017, the Internal Revenue Service denied the claim for refund on September 8, 2017. [Doc. 66 at 6, ¶ 18]. On October 25, 2017, Plaintiffs timely filed this action seeking the refund in question. [Doc. 66 at 6, ¶ 19].

**Opinion Evidence**

24. Mr. Robert Brackett of Crandall & Brackett, Ltd., performed a valuation of GTC common stock effective August 28, 2014. [Ex. 4 (Crandall & Brackett, Ltd.'s Good Technology Corporation Valuation Report)]. The valuation report asserts that it was made "in accordance with commonly accepted business valuation practices, the *Uniform Standards of Professional Appraisal Practice-2018* [] and Revenue Rulings 59-60 and 77-287." [Ex. 4 transmittal letter; Ex. 4 at 3 and n.3]. At trial Robert C. Brackett testified as to the contents and methodology of that valuation. [*See* Tr. at 78, et seq.].

25. Mr. Brackett holds a master's degree in business administration, has a certified public accounting license, is a certified valuation analyst, and has been conducting business valuations for approximately 30 years. [Tr. at 78-80]. He has taught courses and written scholarly articles on business valuation, and he has testified in court many times as an expert in business valuation. [Tr. at 80-84; Ex. 4 at 56-65]. Although Plaintiff's counsel did not actually tender Mr. Brackett as an expert at trial, counsel for the government at one point argued for him to be treated as such. [Tr. at 139]. In any event, based on the evidence presented the Court concludes that Mr. Brackett is qualified as an expert in business valuation and will recognize his testimony as such.

26. Mr. Brackett performed an analysis of the fair market value of the GTC common stock as of August 28, 2014, the date Ms. Vinci-Lucero accepted ownership. [Ex. 4 at 4]. Mr. Bracket defined fair market value in the same manner described above—the price arrived at by willing buyer and a willing seller, without any compulsion to buy or sell, and both parties having reasonable knowledge of relevant facts. [Id.] This included the financial information included in GTC's original form S-1 as amended through June 20, 2014. [Id.; Tr. at 91]

27. Mr. Brackett's valuation took into consideration GTC's business characteristics, including its patents, employees, billings, revenues over the preceding four years, acquisitions of other companies, competing companies in the field (Google and Microsoft), and financing. [Ex. 4 at 5-6]. These showed that "operations were being financed through equity and debt financing," "no distributions were anticipated by management," "management did not expect to turn a profit in the foreseeable future," and no "evidence of a cash flow or earnings stream capable of paying dividends to preferred or common shareholders, with or without an IPO." [Id. at 6]. In addition, "[b]ook value and earnings were negative at GDTC during the 3 years preceding the Valuation Date," with no expected change. [Id. at 7]. The valuation report states that "GCTC was suffering from decreasing billings, not high growth, the inability to borrow additional monies except from venture capital sources, negative book value, negative working capital, and negative earnings with no anticipated change." [Id. at 10]. From January through August of 2014, GTC was "cash strapped. They were going through cash very quickly. They were desperately looking for cash." [Tr. at 91]. This is because as of March 31, 2014, GTC had negative equity of approximately $200 million and retained earnings of negative $633 million. [Tr. at 92].

28. Mr. Brackett also analyzed the GTC stock using the Altman Z-Score formula, which is used to predict the probability that a firm will go into bankruptcy within two years. [Ex.

4 at 17; Tr. at 113]. It is an analysis of the financial health of a company using data regarding corporate income and balance sheet values, and it has gained wide acceptance by auditors and courts, among others. [Ex. 4 at 17]. The Z-score formula takes five different common business ratios and weights them according to a prescribed formula. The resulting score then indicates whether the company is "safe," is in "distress," or is in a middle "grey" zone. The five ratios are working capital/total assets, retained earnings/total assets, earnings before interest and taxes/total assets, market value of equity/book value of total liabilities, and sales/total assets. [Ex. 4 at 18]. The Z-score formula has three different models—original, private manufacturer, and non-manufacturers & emerging market—each of which gives different weights to each of the five ratios. [Ex. 4 at 18-19]. Mr. Brackett ran the financial numbers for GTC as of August of 2014. [Id.]. Under all three models, GTC had a negative Z-score, such that Mr. Brackett characterized it as "severely distressed" [Ex. 4 at 19], and he concluded that there was an "extremely high likelihood that this thing was going to default and have little to no value." [Tr. at 113].

29. The valuation report notes that in 2013 and 2014 GTC had been buying other businesses, probably in an effort to make itself look larger to support an IPO or outright sale. [Doc. 4 at 6; Tr. at 100-101]. GTC purchased the companies using its own stock instead of cash. [Tr. at 101]. In these merger transactions, GTC's stock was assigned a "fair value," not "fair market value." [Tr. at 102-103; *see also* Tr. at 126]. Fair value has several different definitions, none of which is the same as "fair market value." [Tr. at 86-87, 201-202]. Mr. Brackett testified that "best practices in business valuation says that you're looking for transactions that are not stock transactions. You're looking for cash acquisitions because there is less manipulation of equity value in a cash acquisition than there is in a stock-for-stock transaction." [Tr. at 101]. Mr. Brackett concluded that the sales of stock of GTC preceding August of 2014 were based on fair values and

11

thus are not a valid measure of the fair market value of Ms. Vinci' Lucero's stock because "the history of stock sales of GDTC does not appear to be at arm's length, rather they appear to reflect a closely held company experiencing cash flow problems, venture capitalist infusions, and other financing efforts." [Ex. 4 at 11; *see also* Careswell testimony at Tr. at 201-202]. Thus, these merger transactions were not an effective way to find the fair market value of the GTC stock on August 11, 2014.

30.     Mr. Brackett also concluded that Ms. Vinci-Lucero's 2012 stock sale to Harvest Growth in December of 2012 did not impact the fair market value of the stock she received in August of 2014 because it was too remote in time, and the company's financial condition had deteriorated during the intervening nineteen months. [Tr. at 120-121; *see also* Careswell testimony at Tr. at 204].

31.     Mr. Brackett attempted to use several different methodologies to analyze the fair market value of the GTC stock that Ms. Vinci-Lucero received. [Ex. 4 at 11-12; Tr. at 110-111]. These included a net asset value method, [Ex. 4 at 13-14, Tr. at 111], the income method [Tr. at 111], whether there was a valid contract to guarantee a minimum price to buy the stock, whether a close courtroom precedence for the value of the stock, whether there was an industry formula for its value, the value of future of cash flow based on financial data from the S-1, the dividend-paying history, the price-earnings ratio, and industry return-on-equity ratios. [Ex. 4 at 11-12]. However, none of these methodologies generated a positive value for the stock because either GTC's lack of cash flow and large debt led to a negative value (e.g., asset and income methods), or there was no data upon which to base a valuation (e.g., contract method, courtroom precedence, industry formula). [Ex. 4 at 11-12; Tr. at 111-12, 171].

12

32. The market value approach was the only method that allowed Mr. Brackett to come up with a positive value for the stock. [Tr. at 111, 114; *see also* Careswell testimony, Tr. at 212-213]. He looked at "transactions of generally similar sized companies in generally the same industry… [and] used those transactions to identify the value of [GTC]." [Ex. 4 at 28]. Mr. Brackett used four other companies, which he described as being in the "computer software supplies and services group," but not "great comparatives" or competitors for GTC. [Tr. at 153-154].

33. In applying the market value method to GTC, Mr. Brackett started with twelve months of GTC's revenues from April of 2013 through March of 2014 and then multiplied that by 2.03 (a number generated looking at transactions from similar companies as described in the preceding paragraph) to get a $357 million total enterprise value. [Tr. at 115-116]. He then subtracted $26 million in GTC's debt and the $267 million of equity that was available only to preferred shareholders, leaving $66 million in value. That number, divided by 73 million common shares, led to an initial valuation of $0.91 per share. [Ex. 4 at 23; Tr. at 116-117].

34. In his valuation, Mr. Brackett discounted the value of Ms. Vinci-Lucero's GTC stock because it lacked marketability—that is, there was no market, public or private, in which she could sell her stock because it was subject to the lockup agreement. [Tr. at 94-96]. Due to this lack of marketability, Mr. Brackett applied an 18% discount to the value of the GTC stock. [Ex. 4 at 40]. The 18% figure is not directly based on any revenue ruling or case law, but rather on Brackett's professional judgment. [Tr. at 162-164]. In reaching that figure, he relied in part on Revenue Ruling 77-287, the purpose of which is to expand upon Revenue Ruling 59-60 in order to give guidance regarding "the valuation, for Federal tax purposes, of securities that cannot be immediately resold because they are restricted from resale pursuant to Federal securities laws." Rev. Rul. 77-287 § 1, 1977-2 C.B. 319. Revenue Ruling 77-287 § 2 explains the issue to which the

ruling is directed: "It frequently becomes necessary to establish the fair market value of stock that has not been registered for public trading when the issuing company has stock of the same class that is actively traded in one or more securities markets. The problem is to determine the difference in fair market value between the registered shares that are actively traded and the unregistered shares." Thus, it does not expressly apply to the circumstances in this case. However, the ruling does take a balanced approach to determining the reasonableness of a marketability discount. The Court concludes that it is not unreasonable to extrapolate from Revenue Ruling 77-287 and apply its principles here.

    35.    Mr. Brackett also applied a minority interest discount of 25% to the value of Ms. Vinci-Lucero's stock. [Ex. 4 at 41-42]. This discount is given to minority stockholders in a closely held corporation because they have no ability to control the business. [Id.; Tr. 96-97]. "It is generally recognized in valuations that a non-controlling interest in a closely held business is usually worth less than a proportionate share of the value of the assets of the business. No general rule exists for determining the size of the discount." [Ex. 4 at 41]. In reaching an appropriate discount, Mr. Brackett looked at the minority interest discounts tracked in various publications, each showing a range of reasonable discounts: *Federal Valuation Digest 2013/2014 (*10-40%), *MergerStat Review 2014* (6-64%), and *Business Valuation* (22-28%). After reviewing the data, Mr. Bracket arrived at a discount of 25%. [Tr. at 166].

    36.    After removing preferences and adjusting for the lock-up that applied to Ms. Vinci-Lucero's shares, as well as their minority nature, he concluded that the 650,000 shares of GTC common stock had a fair market value of $364,000, or $0.56 per share. [Ex. 4 at 22-23; Tr. at 114-115]. In reaching that conclusion, Mr. Brackett relied upon the definition of fair market value set forth in Revenue Ruling 59-60 and referenced in Paragraph 26, *supra*. [Tr. at 87-88].

37. The government offered the testimony of one witness, Mr. Montgomery Careswell, a valuation specialist with the Internal Revenue Service since 1993. [Tr. at 178-79]. In that capacity he consults with tax auditors, conducting business valuations at their request. [Tr. at 180]. The government offered no evidence regarding Mr. Careswell's education or training in business valuation, nor any evidence that any court has ever accepted him as an expert in business valuation. It did not formally offer Mr. Careswell as an expert witness. The evidence in the record is insufficient for the Court to determine whether Mr. Careswell is qualified as an expert witness.

38. On June 30, 2016, Mr. Careswell wrote a memorandum to the assigned IRS Revenue Agent reviewing the Plaintiffs' amended return for 2014. The agent had asked for Mr. Careswell's opinion regarding the fair market value of GTC stock as of April 23, 2014. [Ex. 5 (Careswell's 2016 memo) at 1]. In the memorandum, Mr. Careswell states that he used the same definition of "fair market value" as Mr. Brackett, in accordance with Revenue Ruling 59-60: "the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts." [Id. at 1 n.1; Tr. at 181]. On the other hand, during his testimony in court Mr. Careswell stated that his job was not to determine fair market value, but rather to determine whether the $0.57 per share value listed on Plaintiffs' amended tax return was "reasonable." [Tr. at 182, 185, 187].

39. Mr. Careswell noted that his memo was not "a formal appraisal review report as described within standards 3, 9, and 10 of the Uniform Standards of Professional Appraisal Practice as the scope of this review was not established in accordance with those standards." [Ex. 5 at 1. n.2; Tr. at 190-191]. Rather, the memo was prepared in order to "provide observations regarding

15

the fair market value of the Settlement Shares as of April 23, 2014 and to assist the IRS in valuation issue resolution discussions with Susan Vinci-Lucero." [Ex. 5 at 1. n.2; Tr. at 191].

    40.    Mr. Careswell asserts that "the value of [GTC] common shares as of April 23, 2014 is best determined by actual transactions close to and prior to the valuation date." [Ex. 5 at 8]. To this end, he points to GTC's acquisition of BoxTone, Inc. on March 28, 2014 (less than one month prior to Mr. Careswell's April 23, 2014 valuation date), in which GTC's common stock was valued at $4.92 per share. [Id.]. Mr. Careswell asserts that this transaction is the best indication of GTC's stock value as of April 23, 2014 "because it is an actual transaction with an unrelated party less than one month prior to the valuation date." [Id.]. As a result of the BoxTone sale, Mr. Careswell asserts that the fair market value should be higher than $2.38 per share. [Tr. at 221]. However, Mr. Careswell also admits that this higher GTC stock value from the BoxTone sale (and the other merger transactions in that time frame) was based on GTC's fair value, not fair market value. [Tr. at 209-210].

    41.    Mr. Careswell asserted the $2.38 per share value used in the court settlement is <u>not</u> the most reasonable value nor is it "fair market value" because it was a value merely agreed to by the two parties in the case and does not meet the definition of Fair Market Value." [Ex. 5 at 8-9; Tr. at 208]. Further, he testified that in the context of litigation you don't have willing buyers and willing sellers [Tr. at 190], suggesting that a value agreed upon by opposing parties in a lawsuit cannot provide the basis for fair market value. Finally, Mr. Careswell stated that the $2.38 settlement agreement value should not carry any weight because it is not as close in time to the valuation date as the BoxTone sale. [Ex. 5 at 8]. However, in what appears to be a bit of a contradiction to these statements, Mr. Careswell testified in court that he "determined that the 2.38

was *more* reasonable than the 57 cents, because that's what was … agreed-agreed to in the settlement between the parties." [Tr. at 187] (emphasis added).

42. In the memorandum, Mr. Careswell notes that various events in 2015 and 2016 subsequent to the valuation date do not bear on the fair market value because they were not known or anticipated as of the valuation date. [Ex. 5 at 9-11]. He disagrees with Plaintiffs' assertion that GTC knew but failed to disclose to them that it was short of cash and trying to sell the company, thereby lowering the fair market value. [Id. at 10-11]. Instead, he contends that these factors were not known or anticipated by GTC before August 1, 2014, when the written settlement agreement was signed, and that "[t]he first indication that Good was in a constrained cash position was not until June 5, 2015." [Id. at 11]. However, Mr. Careswell's memo contains no analysis of GTC's 2014 S-1 form and amendments or the financial data contained therein. [Tr. at 198-199].

43. Mr. Careswell's memo of June 2016 concludes that as of April 23, 2014, either the fair market value or the "reasonable value" for Ms. Vinci-Lucero's 650,000 common shares of GTC was $1.547 million, or $2.38 per share. [Ex. 5 at 1, 11].

44. On November 29, 2018, Mr. Careswell wrote a second memo regarding this case, this one a critique of Mr. Brackett's report. [Ex. 6 (Careswell's 2018 memo) at 1; Tr. at 186]. Like the first memo, the second memo did not contain an appraisal of GTC common stock's fair market value as defined in Revenue Ruling 59-60. [Tr. at 190-191]. Instead, Mr. Careswell critiqued the underlying assumptions in Mr. Brackett's valuation. Among these are that in determining the value of GTC stock, Mr. Brackett used an incorrect multiple of 203%, or 2.03. (*See* paragraph 33, *supra*). Mr. Careswell asserts that a more correct multiple would be 2.18, leading to a value per share of $1.27 before discounts (assuming that all of Mr. Brackett's other assumptions were correct). [Ex. 6 at 4; Tr. at 216, 220].

45.     At trial, Mr. Careswell admitted that due to GTC's lack of income, its lack of tangible assets, and the difficulty in placing a value on its intangible assets, the only remaining option was to use the market analysis method applied by Mr. Brackett. [Tr. at 212-213].

46.     Mr. Careswell agreed with Mr. Brackett that discounts of 18% for marketability and 25% for a minority interest are reasonable. [Tr. at 217].

**Analysis**

47.     The GTC common stock at issue should be valued as of August 11, 2014, the date the shares were issued to Ms. Vinci-Lucero. *United States v. Roush*, 466 F.3d 380, 385 (5th Cir. 2006). The standard for performing a valuation of the stock is fair market value, which is the price at which a willing buyer and willing seller with knowledge of all the relevant facts would agree to exchange the property or interest at issue.

48.     The settlement agreement between GTC and Ms. Vinci-Lucero was the product of negotiations between the parties in an effort to end litigation. Therefore, GTC was not a willing seller of the stock, and Ms. Vinci-Lucero was not a willing buyer; both were under compulsion. The $2.38 per share price in the settlement agreement was not an indication of the fair market value of GTC's common stock. Furthermore, the parties have agreed that the economic substance of the stock transaction should govern the tax consequences of the transaction and not the value set forth in the Plaintiffs' Settlement Agreement. [Doc. 66 at 8].

49.     Mr. Brackett is an expert in the field of business valuation. He performed a thorough and credible analysis of the value of the GTC common stock as of August 11, 2014, applying the standards set forth in Revenue Ruling 59-60 and the *Uniform Standards of Professional Appraisal Practice-2018*. His testimony at trial was credible.

50. In the year prior to August 11, 2014, GTC was extremely cash poor, suffering from decreasing billings, limited growth, the inability to borrow additional monies except from venture capital sources, negative book value, negative working capital, and negative earnings, with no anticipated change in its circumstances. Mr. Brackett's analysis and review of GTC's Altman-Z score as of August 11, 2014, showed that the company was severely distressed and unlikely to survive the next two years.

51. The severity of GTC's distress presented a challenge to performing a valuation of its stock. Typically, valuation experts can use various methodologies to analyze the fair market value of a company's stock. These include the net asset value of the company, the company's income and future earnings, a valid contractual guarantee of a minimum price to buy the stock, a close courtroom precedence for the value of the stock, an industry formula for its value, the value of future of cash flow based on financial data from the S-1, the dividend-paying history, the price-earnings ratio, and industry return-on-equity ratios. However, due to GTC's severe lack of cash flow and large debt, its inability to pay dividends for the foreseeable future, and the absence of a contractually guaranteed price or a court precedent, none of these methodologies generated a positive value for the stock. Each of them led to a negative value, or no data existed upon which to base a valuation. Therefore, the only viable valuation approach that remained was a market analysis of companies similar to GTC, known as the "market value method."

52. Market value approach was the only method that allowed Mr. Brackett to come up with a positive value for the GTC stock. [Tr. at 111, 114; *see also* Careswell testimony, Tr. at 212-213]. By researching transactions and fair market values of four similarly sized companies in generally the same industry, Mr. Brackett was able to compute a fair market value of GTC's common stock of $0.91 per share.

53. It was proper for Mr. Brackett to use his professional judgment and decline to use the stock values from the BoxTone and other merger sales because they relied upon a fair value, not a fair market value, of the GTC stock. It was also proper for him to use his professional judgment to apply an 18% discount for marketability and a 25% discount for minority status.

54. Plaintiffs carried their burden to show that on August 11, 2014, the fair market value of the GTC common stock that Ms. Vinci Lucero received was $0.57 per share. The burden then shifted to the government, which did not carry its burden to show that this amount was unreasonable or not supported by the evidence. The Government did not prove that the fair market value of the stock was $2.38 per share.

55. The Court finds that the fair market value of the GTC stock that Ms. Vinci-Lucero received on August 11, 2014 was $0.57 per share. Plaintiffs are entitled to the tax refund that they requested in their Complaint.

_____
SENIOR UNITED STATES DISTRICT JUDGE